UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADP COMMERCIAL
LEASING, LLC, *et al.*,

      Plaintiffs,

                                  Case No. 14-10549

v.

                                  Hon. John Corbett O'Meara

JOHN OBEID, *et al.*,

      Defendants.

_____/

## OPINION AND ORDER

      Before the court are the parties' cross-motions for summary judgment.  The court heard oral argument on December 10, 2015, and took the matter under advisement.

## INTRODUCTION

      In 2012, Plaintiffs ADP Commercial Leasing LLC, CDK Global LLC, and IP Networked Services, Inc. obtained a judgment against Peninsula Automotive Group II, which did business as Metropolitan Lincoln-Mercury ("MLM"). Plaintiffs had leased computer and other equipment to MLM.  MLM failed to pay after going out of business in 2011.  Plaintiffs' judgment was in the amount of approximately $400,000, not including post-judgment interest.

Unable to collect on their judgment, Plaintiffs filed this suit against companies and individuals related to MLM, seeking to avoid an alleged fraudulent transfer and pierce the corporate veil.  Defendants in this case are John Obeid, Cullan Meathe, Peninsula Automotive Group, LLC, Peninsula Automotive Group II, LLC, 32000 Ford Road, LLC, and MLM.  Plaintiffs have obtained a default judgment against all Defendants except for John Obeid, who was the dealer operator of MLM.  Plaintiffs allege that Obeid received a fraudulent transfer from MLM in 2011, which Plaintiffs seek to avoid.  Plaintiffs also allege that MLM's corporate veil should be pierced as to Obeid, subjecting him to liability for MLM's debt to Plaintiffs.  Plaintiffs and Obeid have filed cross-motions for summary judgment.

## **BACKGROUND FACTS**

Metropolitan Lincoln-Mercury, LLC, was formed in 2006 to operate an automotive dealership in Garden City, Michigan.  32000 Ford Road, LLC, owned the real property where MLM operated the dealership.  Peninsula Automotive Group, LLC, and Peninsula Automotive Group II, LLC, were holding companies for MLM, 32000 Ford Road, and Zephyr Financial (which is not a party).  At the time MLM was formed, Cullan Meathe had a 85% interest, Dan Ret had a 10% interest, and John Obeid had a 5% interest in the company.  Later, Meathe's

interest was increased to 90% and Obeid's was increased to 10%. Obeid was responsible for the day-to-day management of the dealership.

MLM went out of business in June 2011, as a result of Ford Motor Company's decision to discontinue the Mercury brand and the poor market for automobile sales. Prior to June 2011, Ford negotiated with MLM and its lender, Talmer Bank, to facilitate a voluntary closing of the dealership. At the time, MLM owed Talmer approximately $10 million. The parties entered into two agreements.

MLM and related companies, as well as Cullan Meathe and John Obeid, entered into a Settlement Agreement with Ford regarding the closing of the dealership. Ford (and some participating dealers) agreed to pay $3,500,000 as follows: $2,050,000 payable to MLM and Talmer; $1,150,000 payable to MLM, and $300,000 to be credited to MLM's parts account. See Def.'s Ex. E. Ford acknowledged that "Metropolitan shall cause to be paid to John Obeid One Million One Hundred Fifty Thousand Dollars ($1,150,000 USD) in consideration for his execution, as the dealer operator of Metropolitan, of the agreement by which Metropolitan resigns as a Lincoln franchisee and releases Ford from all claims thereby enabling Ford to re-assign the territory as described below." Id. at 2.

At the same time as the Settlement Agreement, Talmer Bank entered into a

Liquidation Agreement with Defendants MLM, related companies, Meathe, and Obeid. The Liquidation Agreement contemplated a shutdown and orderly liquidation of MLM's assets, including the proceeds of the Settlement Agreement. Defendants agreed to pay $2,050,000 of the funds received from Ford directly to Talmer. Obeid agreed to continue to serve as the owner/operator of MLM and to assist in the liquidation. Def.'s Ex. A at ¶7. Talmer agreed that it "will not make a claim or sue Ford or Obeid for payment by MLM of $1,150,000 to Obeid from the sum of $3,500,000 payable to MLM under the Settlement Agreement." Id. at ¶5. The agreement provided that Obeid was not to receive "additional compensation" beyond the amount paid by Ford pursuant to the Settlement Agreement. Id. at ¶7.

As the senior lienholder, Talmer was entitled to the full $3,500,000 MLM received from Ford, because MLM owed Talmer significantly more than that and was in default. See Def.'s Resp. at Ex. 1 (Notice of Default dated December 14, 2010). As of December 14, 2010, Talmer informed MLM that it was to hold all proceeds of all collateral "in trust" for Talmer and that "[t]hese proceeds should include any and all amounts received from Ford Motor Company or any of its affiliates related to the termination of the Mercury line." Id. at 2.

The parties testified, however, that the settlement deal between Ford and Defendants would not have gone through (Obeid would not have signed) unless

Obeid received both a payment from Ford and Talmer's agreement not to assert a claim to those funds.  After the settlement, all funds from the liquidation were paid to Talmer, because it was the first secured lender.  The junior secured lenders and all other creditors, including Plaintiffs, did not receive any of the proceeds of the liquidation.  After the liquidation, MLM still owes a significant amount of money to Talmer (more than the amount paid to Obeid), which continues to have a first priority lien over MLM's assets. See Def.'s Ex. B.

## LAW AND ANALYSIS

### I.      Standard of Review

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### II.     Michigan Uniform Fraudulent Transfer Act

Plaintiffs contend that the $1,150,000 payment by MLM to Obeid violates the Michigan Uniform Fraudulent Transfer Act, M.C.L. 566.31, *et seq*.  Plaintiffs seek to avoid the transfer and have its judgment paid from those funds.

The MUFTA is "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." Dillard v. Schlussel, 308 Mich. App. 429, 446 (2014).  The statute provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation in either of the following:
>
> (a)     With actual intent to hinder, delay, or defraud any creditor of the debtor.
> (b)     Without receiving a reasonably equivalent value in exchange for the transfer or obligation . . . .

M.C.L. 566.34(1).  Plaintiffs contend that the transfer was made in violation of

M.C.L. 566.34, as well as M.C.L. 566.35, which provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

M.C.L. 566.35(1).

Defendant Obeid argues that the MUFTA does not apply, because there was no "transfer" of an "asset" of MLM as defined by the statute.  The act defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." M.C.L. 566.31(l).  An asset is defined as "property of a debtor, but the term *does not include* any of the following: (i) *property to the extent it is encumbered by a valid lien*." M.C.L. 566.31(b) (emphasis added).  A "lien" includes "a security

-6-

interest created by agreement. . . ." M.C.L. 566.31(h).  A "valid lien" is a lien that "is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." M.C.L. 566.31(m).

Defendant argues that Talmer holds a valid lien on all of MLM's assets, including cash, deposit accounts, contracts, and future funds. <u>See</u> Def.'s Ex. C (UCC financing statement, filed October 6, 2006).  According to Defendant, the check written by Ford to MLM was not an "asset" of MLM because it was encumbered by Talmer's lien.  Talmer agreed not to sue Ford or Obeid for the $1,150,000, and agreed that the money was to be paid to Obeid.  Talmer did not expressly release or waive its lien, however:

> Lender [Talmer] will not make a claim or sue Ford or Obeid for payment by MLM of $1,150,000 to Obeid from the sum of $3,500,000 payable to MLM under the Settlement Agreement. *Lender will retain all rights and remedies Lender may have in and to the Obeid Payment as against any parties other than Ford and Obeid including, without limitation, pursuit of any avoidance recoveries under appropriate state and federal laws.*

Def.'s Ex. A (Liquidation Agreement) at ¶5 (emphasis added).

The parties agree that Talmer could have asserted its right to the $1,150,000 MLM paid to Obeid pursuant to its security interest.  At the time Ford made the payment to MLM, Talmer had a security interest in all of MLM's assets, including the Talmer account into which the payment was deposited.  Talmer could have

"swept" MLM's account and applied the $1,150,000 to MLM's debt.  Had the

bank done so, it is clear that Plaintiffs would not have a fraudulent transfer claim

against Talmer, because that money was encumbered by Talmer's lien and was not

an "asset" of MLM.  See M.C.L. 566.31(b)(i); In re CyberCo Holdings, Inc., 382

B.R. 118 (Bankr. W.D. Mich. 2008) (no fraudulent transfer under bankruptcy law

or Michigan UFTA when bank swept funds from debtor's account that were

subject to its security interest); In re Clements Mfg. Liquidation Co., 521 B.R. 231,

249 (Bankr. E.D. Mich. 2014) ("[A] debtor's transfer of property that is fully

encumbered by a valid lien cannot be considered a 'transfer' that can be avoided

under any of the provisions of the UFTA.").

In other words, "a debtor can fraudulently transfer to another only that which

the debtor actually owns." CyberCo, 382 B.R. at 142.  Pursuant to the Liquidation

Agreement and its security interest, Talmer agreed to the transfer of *its* property –

not MLM's – to Obeid.

This transfer is not actionable under the circumstances here, when MLM

owed significantly more to its first priority secured creditor than was recovered

through the liquidation of MLM's assets.  Had the transfer not been made to Obeid,

the money would have been recovered by Talmer, whose lien remains unsatisfied.

Therefore, Plaintiffs are unable to demonstrate that they were prejudiced by the

-8-

transfer.  See Chemtex L.L.C. v. St. Anthony Enter., Inc., 490 F. Supp.2d 536, 542 (S.D.N.Y. 2007); A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama, 560 F. Supp. 705, 711 (E.D. Pa. 1983), aff'd 729 F.2d 1446 (3d Cir. 1984); Mehrtash v. Mehrtash, 93 Cal. App. 4th 75, 80 (2001).[1]

As the Chemtex court explained, to "challenge a conveyance as fraudulent, a plaintiff must suffer prejudice or injury as a result of the conveyance at issue." Chemtex, 490 F. Supp.2d at 542.  A complaining creditor must show that "some portion of the debtors assets would have been available to satisfy the unsecured creditor's claims had there been no conveyance." Id.  "Absent any such equity in the assets conveyed, an unsecured creditor lacks standing to challenge the conveyance as fraudulent." Id.

Indeed, the statutory language implies as much, by stating that a transfer that is "fraudulent *as to a creditor*" may be set aside.  See M.C.L. 566.34, 566.35 (emphasis added); Mehrtash, 93 Cal. App. 4th at 80 (construing the same language in California's UFTA and holding that "[i]t cannot be said that a creditor has been injured unless the transfer puts beyond [her] reach property [she] otherwise would

---

[1] The MUFTA is an adaptation of a model act.  Consistent with the act's purpose "to make uniform the law of fraudulent transfers," it is appropriate for the court to consider case law from other states that have adopted the Uniform Fraudulent Transfer Act.  See M.C.L. 566; In re Teleservices Grp., Inc., 469 B.R. 713, 755 (Bankr. W.D. Mich. 2012); Bev Smith, Inc. v. Atwell, 301 Mich. App. 670, 681 (2013).

be able to subject to the payment of [her] debt"); In re Rountree, 448 B.R. 389, 406 (Bankr. E.D. Va. 2011) ("The UFTA embraces the well-settled principle that only one prejudiced by an allegedly fraudulent transfer may attack the transfer through fraudulent conveyance law."). This issue arises infrequently, "because creditors ordinarily do not seek to invalidate transactions that cause them no injury." A/S Kreditt-Finans, 560 F. Supp. at 711.

Here, even if the transfer had not been made, there would not have been sufficient assets to satisfy Talmer's lien, let alone Plaintiffs' junior interest. Accordingly, Plaintiffs have failed to state a claim under the MUFTA as a matter of law. See Mehrtash, 93 Cal. App. 4th at 82 ("Even assuming that plaintiff proved the elements of a constructively fraudulent transfer, plaintiff failed to prove she was injured by it."); Chemtex, 490 F. Supp.2d at 542 ("[A] creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance."). See also Melamed v. Lake Cty. Nat'l Bank, 727 F.2d 1399, 1401-1402 (6th Cir. 1984) (no fraudulent transfer under the Bankruptcy Act because the transfer to bank with valid security interest did not diminish the assets available to creditors); Fidelity Bond & Mortg. Co. v. Brand, 371 B.R. 708, 719-20 (E.D. Pa. 2007) (noting that the constructive fraud provisions of the UFTA and Bankruptcy Code are virtually

identical and should be interpreted uniformly and consistently).

## III.   <u>Piercing the Corporate Veil</u>

Plaintiffs are also seeking to pierce the corporate veil and hold Obeid

personally liable for MLM's debt to Plaintiffs.  Under Michigan law, there is a

presumption that the corporate form will be respected.  <u>Servo Kinetics, Inc. v.

Tokyo Precision Instruments Co.</u>, 475 F.3d 783, 798 (6th Cir. 2007).  The corporate

veil "may be pierced only when an otherwise separate corporate existence has been

used to subvert justice or cause a result that is contrary to some overriding public

policy." <u>Id.</u> (quoting <u>Seasword v. Hilti</u>, 449 Mich. 542, 537 N.W.2d 221, 224

(1995)).  "Michigan courts will not pierce the corporate veil unless (1) the

corporate entity was a mere instrumentality of another entity or individual; (2) the

corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered

an unjust loss." <u>Id.</u> (citation omitted).

Plaintiffs have not demonstrated that the corporate veil should be pierced as

to Obeid.  As discussed above, Plaintiffs have not shown that they suffered a loss,

let alone an "unjust loss" as a result of the payment to Obeid or Obeid's conduct.

<u>See</u> <u>Green v. Ziegelman</u>, 310 Mich. App. 436, 2015 WL 2142690 at *12, <u>appeal

denied</u>, 871 N.W.2d 180 (Mich. 2015) (the plaintiff must show "the owner

exercised his or her control over the entity in such a manner as to *wrong the*

-11-

*complainant*"); Starks v. Michigan Welding Specialists, Inc., 2005 WL 3179647 at *6 (Mich. App. Nov. 29, 2005) ("[A]lthough plaintiff suffered the loss of being able to collect his judgment from Dualtech, this loss was not unjust because, as even plaintiff admitted, National City's security interest in Dualtech's assets was prior to his own."). Accordingly, the court will deny Plaintiffs' motion on this ground.

## ORDER

IT IS HEREBY ORDERED that Defendant Obeid's motion for summary judgment is GRANTED and Plaintiffs' motion for summary judgment is DENIED.


                                        s/John Corbett O'Meara
                                        United States District Judge
Date:  January 7, 2016


I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, January 7, 2016, using the ECF system.


                                        s/William Barkholz
                                        Case Manager

-12-